## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JAMES C. SNOW,

     Plaintiff,

     v.

GHALIAH OBIASI, et al.,

     Defendant.

Case No. 1:17 cv 4015

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff James Snow, an inmate at Stateville Correctional Center, has suffered from a myriad of chronic illnesses for several years. He now sues Stateville's medical services provider, Wexford Health Sources; three of Wexford's doctors, Drs. Obaisi, Bautista, and Okezie; and two of Stateville's former wardens, Randy Pfister and Walter Nicolson, under 42 U.S.C. § 1983 for deliberate indifference to his serious medical conditions. All of the Defendants have moved for summary judgment. [187]; [194]; [198]; [201]; [204]. For the reasons explained below, this Court grants Wexford's motion for summary judgment [204]; grants in part and denies in part Dr. Obaisi's motion for summary judgment [201]; grants in part and denies in part Dr. Bautista's motion for summary judgment [198]; denies Dr. Okezie's motion for summary judgment [194]; and denies Nicholson and Pfister's motion for summary judgment [187].

1

## I.     Background

This Court takes the following facts from the various Defendants' statements of fact, [189]; [206]; [203]; [196]; [200]; Plaintiff's responses to Obaisi's statements of fact [228]; Plaintiff's responses to Nicolson and Pfister's statements of fact [233]; Plaintiff's statements of additional fact [219]; and Bautista, Obaisi, Okezie, and Wexford's responses to Plaintiff's statements of additional fact [265].

### A.     The Parties

Plaintiff is incarcerated within the Illinois Department of Corrections (IDOC) at Stateville.  [189] at ¶ 1.

Pfister served as the Warden of Stateville from November 2015 until January 2018, and again from August 2019 until January 2020.  *Id.* at ¶ 2.  Nicholson served as the Warden of Stateville from March 1, 2018 through December 31, 2018.  *Id.* at ¶ 3.

Wexford is a corporation that contracts with the State of Illinois to provide medical services to inmates at Stateville.  [206] at ¶ 2.  Dr. Obaisi served as Medical Director of Stateville from 2011 to his death in December 2017.  [203] at ¶ 3; [228] at ¶ 3.  Dr. Okezie served as the Medical Director of Stateville for a period of time during Plaintiff's incarceration, and Dr. Bautista served as a licensed physician at Stateville for a period of time, also during Plaintiff's incarceration.  [196] at ¶¶ 4, 5; [200] at ¶ 5.

## B.      Plaintiff's Various Medical Conditions

According to Plaintiff, since 2009 he has struggled with various nodules[1] on various parts of his body that have increased in number and size and grown more painful over the years. [219] at ¶ 1. As of today, he has more than 45 modules, 15 of which are quarter-sized. *Id.* at ¶ 3. Most of Plaintiff's nodules cause him pain, and altogether, cause him to feel pain throughout his body on a consistent basis. *Id.* at ¶ 5. In some areas, the pain emanating from the nodules radiates out from the nodule into the surrounding area, while in other areas, the nodules cause a sharp, shooting pain. *Id.* According to Plaintiff, the nodules have interfered with his ability to do everyday activities, sleep, and occasionally think clearly; they also affect his mood. *Id.* Plaintiff asserts that his pain could be greatly alleviated if some of his nodules were removed. *Id.* at ¶ 6.

Since 2016, Plaintiff has also struggled with gastrointestinal issues, including chronic diarrhea, which he experiences six to eight times a day nearly every day. *Id.* at ¶ 7. Further, Plaintiff experiences constant dull pain in his abdomen, which has not been alleviated with medication or through dietary changes. *Id.* Plaintiff also suffers from back pain, which has not been alleviated through medication or treatment. *Id.*

Since 2010, Plaintiff has experienced urological issues, including frequent and uncontrollable urges to urinate. *Id.* at ¶ 9. Plaintiff wakes up to urinate at least

---

[1] The parties use the terms "nodules" and "lipomas" interchangeably when referring to the nodules on Plaintiff's body, so this Court does so here as well.

3

three to five times a night, and although he receives medication, Plaintiff claims that it has not provided significant relief. *Id.*

### C. Medical Concerns from 2009 through 2015

On July 16, 2009, a Stateville physical examination form documented Plaintiff's complaints of "heart palpitations" and "frequent urination at night." [220-2] at 2.

Plaintiff saw a specialist, Dr. Michael Warso, at the University of Illinois-Chicago Medical Center (UIC) in August 2012. [219] at ¶ 11; [220-5] at 2. Dr. Warso diagnosed Plaintiff with "multiple lipomas" upon examination of his nodules and found excision "not necessary from a medical point of view." [220-5] at 2. Dr. Obaisi signed off on this report as the reviewing physician. *Id.*; [219] at ¶ 11. According to Plaintiff, however, the examination of his nodules took less than five minutes, and Dr. Warso examined only his arms, even though Plaintiff told him about other painful nodules located elsewhere on his body. [219] at ¶ 11.

In June 2013, Plaintiff again went to the UIC clinic and reported that the lipomas were becoming increasingly more painful. *Id.*; [220-4] at 2. The physician assistant recommended referring Plaintiff for a "second opinion on painful lumps," but the referral did not ultimately occur. [219] at 11; [220-4] at 2.

Plaintiff testified that he complained to Dr. Obaisi about his painful nodules every time he saw him from 2012 onward; whenever he asked Dr. Obaisi to remove them, Dr. Obaisi said he "wasn't going to do it." [219] at ¶ 12.

4

### D.    Medical Concerns in 2016

On March 17, 2016, an unknown provider examined Plaintiff at Stateville, and the medical records from that visit noted "multiple lipomas scattered" and "pain in lower back, radiating."  [219] at ¶ 13; [220-6] at 2–3.  At that time, Plaintiff was prescribed anti-inflammatories and muscle relaxants.  [219] at ¶ 13.

In June 2016, Dr. Obaisi saw Plaintiff at the Stateville clinic and documented that Plaintiff was experiencing pain in the left lower quadrant of his body and that Plaintiff reported occasional blood in his stool.  *Id.* at ¶ 14.  Dr. Obaisi also documented that Plaintiff reported experiencing nocturia, a condition where a person wakes up in the night with urge to urinate three to four times per night. *Id.*  At that visit, Dr. Obaisi diagnosed Plaintiff with abdominal pain and prescribed Flomax, Bentyl, Fiberlax, and Cipro.  *Id.*

On June 18, 2016, Plaintiff filed a grievance, explaining that he was experiencing lower back pain shooting down his right leg, blood in his stool and urine, pain in his lower abdomen, and a firm and enlarged prostate.  *Id.* at ¶ 15.

Less than two months later, on August 1, Dr. Obaisi saw Plaintiff, documenting that Plaintiff reported pain on the left side of his abdomen and four to five bowel movements a day.  *Id.*  Dr. Obaisi again assessed Plaintiff's condition as "abdominal pain" and questioned in his notes "Colon disorder?"  *Id.*  Dr. Obaisi ordered a fecal occult blood sample, prescribed Flagyl, and scheduled Plaintiff for a follow-up two weeks later.  *Id.*

At Plaintiff's follow-up appointment on August 15, Dr. Obaisi examined Plaintiff and noted that Plaintiff reported that he still experienced occasional pain in his lumbar area that radiated to his groin. *Id.* at ¶ 17. Dr. Obaisi indicated that he believed Plaintiff had irritable bowel syndrome (IBS) and prescribed Bentyl and Flomax; he also indicated that a follow-up should occur in six weeks. *Id.*

Less than two weeks after this visit, on August 24, 2016, Plaintiff filed a grievance complaining of serious back pain. *Id.* at ¶ 19. In the grievance, Plaintiff stated that the pain had increased and had spread to his left lower and upper abdomen and to his upper stomach area. *Id.*

About a month later, on September 15, 2016, as documented on a Stateville medical progress notes form, Plaintiff reported "I still have the same aches and pains" on "my back down to my right left and stomach." [220-12] at 2. When asked if he could wait to see a doctor, Plaintiff replied, "I guess I could wait." *Id.*; [265] at ¶ 20.

At his next appointment on September 28, Dr. Obaisi examined Plaintiff, documenting the following: "Follow up irritable bowel syndrome. Still has several BMs [bowel movements] [illegible]. Cough x few days. Drinks a lot of water and has 3-4 urinations at night. Assessment: IBS, Benign Prostatic Hypertrophy." [219] at ¶ 20.

Two days later, on September 30, 2016, Plaintiff filed a third grievance. *Id.* at ¶ 21. In this September 30 grievance, Plaintiff stated he was experiencing severe lower back pain, that his bowel movements were becoming more diarrhea-like, and

that he had a constant dull ache in his rectal area. *Id.* Plaintiff also complained that no diagnostic tests had been completed. *Id.*

On October 1, 2016, Plaintiff again requested to see a doctor, and Dr. Obaisi saw him on November 2. *Id.* at ¶ 22. In his notes, Dr. Obaisi reported that Plaintiff "still has low abdominal pain, no more nocturia on Flomax, and 2-3 BM a day." [220-14] at 2.

On November 25, 2016, Plaintiff filed another grievance complaining that Dr. Obaisi had ignored a 2012 recommendation for Plaintiff to be sent for a biopsy and removal of the nodules; that, in 2010, a urology specialist recommended that certain tests be performed, but those recommendations were ignored; and that he was experiencing back and stomach pain. [219] at ¶ 23.

Dr. Obaisi sent a referral to Wexford's "Site Medical Director & HSA" on November 28, 2016. *Id.* at ¶ 24; [220-17] at 2. The referral states: "Received referral for GI eval at UIC," and that "Dr. Obaisi okay" with "waiting for an appointment at UIC." [220-17] at 2.

### E. Medical Concerns in 2017

On February 22, 2017, Plaintiff was seen for and assessed with "chronic low back pain with radiculopathy," and was referred for physical therapy. [219] at ¶ 26. And on May 17, 2017, Plaintiff had his GI consult with a Nurse Mellgren; Dr. Obaisi reviewed the report from the consult the next day. *Id.* at ¶ 28. About a week later, on May 24, 2017, Dr. Obaisi informed Plaintiff that he was approved for a colonoscopy. *Id.*

On August 29, 2017, Dr. Obaisi examined Snow and documented the following in his notes: "Urinary frequency improved slightly. [Illegible] still has 4-5 urinations at night and very concerned about back pain and abdominal discomfort. Awaiting colonoscopy UIC." *Id.* at ¶ 29. Dr. Obaisi assessed that Plaintiff had "Benign prostatic hypertrophy with [illegible], low back pain and anxiety." *Id.* Dr. Obaisi increased Plaintiff's prescription for Flomax and prescribed Elavil. *Id.*

Plaintiff testified that he felt that Dr. Obaisi did not take his issues seriously and recalled a conversation with Dr. Obaisi during which Dr. Obaisi said to him: "you're a prisoner, what sort of healthcare do you really think you're going to get here," and when Plaintiff replied, "the same kind of healthcare you're getting," Dr. Obaisi laughed. *Id.* at ¶ 30.

Later that year, on December 12, 2017, Dr. Obaisi submitted a nonformulary drug request for Finasteride to treat "obstructive benign prostatic hypertrophy"; he did so because Plaintiff was not responding to Flomax. *Id.* at ¶ 31. A week later, Plaintiff underwent a diagnostic colonoscopy. [220-27] at 2. The colonoscopy produced the following findings: "non-thrombosed internal hemorrhoids"; a "4 mm, non-bleeding polyp was found in the descending colon" and was "removed with a jumbo cold forceps"; a "few hyperplastic, non-bleeding polyps were found in the rectum"; and a "few small-mouthed diverticula were found in the sigmoid colon and descending colon." *Id.* at 3. The colonoscopy report noted Plaintiff's diagnoses included "[n]oninfective gastroenteritis and colitis." *Id.* at 5. Although the attending physician recommended that Plaintiff return to UIC for follow-up one month after

8

the colonoscopy, Plaintiff did not return to UIC until about five months later. [219] at ¶ 32.

### F.     Medical Concerns in 2018

On April 13, 2018, Plaintiff visited the prison health care unit (HCU) at Stateville and indicated there that he had not seen the colonoscopy results from December 2017. *Id.* at ¶ 33; [220-29] at 1. Plaintiff's medical chart recorded the following about Plaintiff's nodules: "Multiple masses, soft, mobile, [illegible], scattered bilateral upper extremities, bilateral lower extremities, abdomen." [219] at ¶ 33; [220-29] at 4.

On June 8, 2018, Defendant Okezie assessed Plaintiff; the notes from that visit reflect that Dr. Okezie ruled out "lipoma" or "lymphadenopathy and lymphadenitis." [219] at ¶ 34. Dr. Okezie prescribed an antibiotic, Bactrim DS, for Plaintiff. *Id.* Plaintiff saw Dr. Okezie again about a month later, on July 6, 2018. *Id.* at ¶ 35. The record from that visit reflects that Plaintiff complained of painful nodules on his forearm and received Bactrim DS. *Id.* at ¶ 36. Dr. Okezie also referred Plaintiff to general surgery. *Id.* But on July 10, 2018, Dr. Okezie, among others, decided to not authorize the referral to general surgery, instead opting to treat Plaintiff "onsite," which according to Plaintiff, meant that they were merely observing Plaintiff's condition. *Id.* at ¶ 37.

Plaintiff testified that, during one of his doctor's visits, Dr. Okezie "basically laughed at [him] and said it's impossible for those to cause pain." *Id.* at ¶ 38.

9

### G.     Medical Concerns in 2019

On March 5, 2019, Dr. Bautista saw Plaintiff in the clinic; Plaintiff complained about diarrhea occurring seven to eight times a day and pain in lipomata. [200] at ¶ 16. Dr. Bautista assessed him with "lymphocytic colitis and lipomata" and recommended Tylenol twice a day for two months and the continuation of Budesonide before considering Mesalamine. *Id.*

On March 22, 2019, Plaintiff filed another grievance stating that he wanted to discuss ongoing stomach pain and gastrointestinal issues, the numbness and pain in his arm due to his nodules, his constant and frequent urination at night, and his back and tailbone pain. [219] at ¶ 40. On March 28, 2019, a physician's assistant assessed him, noting "intermittent radiculopathy with multiple lipomas" and made a referral to a Dr. Henze. *Id.* at ¶ 41. At that visit, Plaintiff also complained about diarrhea, noting that the medications he had been previously given did not result in any improvements. *Id.* Plaintiff also complained about lower abdominal pain, with the pain radiating to his back. *Id.*

On April 9, 2019, Plaintiff complained to Dr. Bautista about numbness and a tingling sensation in his forearm and told him that he was still having diarrhea eight to ten times a day at times. *Id.* at ¶ 42. Dr. Bautista diagnosed neuropathy and lymphocytic colitis and prescribed Nortriptyline and Mesalamine, scheduling a follow up appointment after three months. *Id.*

The next month, Plaintiff filed a grievance stating that Dr. Bautista had prescribed him Pamator for his pain but had not discussed any possible side effects

10

of the medication with him. *Id.* at ¶ 43. The May 21, 2019 grievance also stated that Plaintiff tried to tell Dr. Bautista that his Flomax was no longer working but Bautista would not discuss that issue with him. *Id.*

Plaintiff saw Dr. Bautista on June 12 for a follow-up regarding his lipoma issues. *Id.* at ¶ 44. At that visit, Plaintiff reported feeling "weird," "loopy," and "dizzy" from the Nortriptyline, and said he remained in pain and numb from forearm to finger. *Id.* at ¶ 44. Dr. Bautista charted that Plaintiff's left forearm showed "new lipomas" and that tapping one at the "medial aspect elicited travelling pain and numbness to the fifth finger." *Id.*; [220-38] at 2. Dr. Bautista discontinued Plaintiff's use of Nortriptyline and prescribed Cymbalta. [210] at ¶ 44.

Dr. Bautista saw Plaintiff again on September 24, 2019, at which time Plaintiff told Dr. Bautista that he had been experiencing low back pain for the past three years, that Cymbalta had helped with numbness in his fifth finger, and that fiber tabs helped with diarrhea. *Id.* at ¶ 45. Dr. Bautista performed a "straight leg test," which indicated that Plaintiff experienced shooting pain down to his right leg. *Id.* Dr. Bautista assessed that Plaintiff had low back pain with sciatica and prescribed Tylenol and an increase in Cymbalta to 60 mg. *Id.* Dr. Bautista also referred Plaintiff to physical therapy and requested an x-ray of Plaintiff's lumbosacral spine. *Id.*

Plaintiff visited the HCU on December 16, 2019, where he again discussed the pain associated with his lipomas. *Id.* at ¶ 46. The chart noted that there were "soft, palpable golf ball-sized subcutaneous lumps visible on forearms." *Id.* At the time, Plaintiff took Neurontin for nerve pain. *Id.*

11

Plaintiff also testified that, during a subsequent appointment, Dr. Bautista doubled the dose on Flomax.  *Id.* at ¶ 47.

## H.    Dr. Anderson's Expert Report

Plaintiff's retained expert, Dr. Irsk Anderson, is a board-certified internist at the University of Chicago and prepared a report analyzing Plaintiff's medical care as to his lower back pain, abdominal pain, urinary issues, and skin nodules.  [208-8] at 1.

As to Plaintiff's lower back pain, Dr. Anderson opines that the delay in treatment "could reasonably lead to worsening pain intensity and frequency that may at this point be irreversible" and that the providers fell below the appropriate standard of care in treating his back pain.  *Id.* at 6–7.  According to Dr. Anderson, standard care for acute lower back pain includes anti-inflammatory medication, heat, massage, moderate activity, muscle relaxants, and often physical therapy.  *Id.* at 6.  Dr. Anderson noted that Plaintiff was prescribed anti-inflammatories and muscle relaxants at his initial presentation in March 2016, but even though he saw providers in July and September 2016, those providers offered no other medication or physical therapy.  *Id.* at 6.  According to Dr. Anderson, these "[l]arge gaps" between clinic assessments, repeated courses of ineffective medications, and delayed physical therapy resulted in chronic pain that Plaintiff continues to experience this day.  *Id.* at 7.  Dr. Anderson also states that Plaintiff could have been, but never was, diagnosed and treated through a variety of methods such as: (1) an MRI; (2) nerve and muscle evaluation; or (3) referral to a provider to perform lumbar epidural steroid

injections or nerve ablation, or, if an MRI showed surgical indications, referral to a neurosurgeon and orthopedic spine surgeon. *Id.* at 7.

As to Plaintiff's abdominal pain, Dr. Anderson opines that the staff were too "quick to diagnose" his condition as IBS because specific diagnostic criteria apply to that condition, and it "is a diagnosis of exclusion" that requires one to rule out infectious, autoimmune, endocrine, and metabolic etiologies prior to arriving at the diagnosis. *Id.* at 8–9. Dr. Anderson also opines that the standard of care for treating chronic diarrhea includes lab tests, a chemistry panel, ESR/CRP, celiac disease antibodies, a thyroid assessment, and stool testing. *Id.* at 9. Moreover, because Plaintiff had "alarm features" (i.e., blood in stool, worsening abdominal pain, and symptom onset when he was over fifty years old), the standard of care requires an upper endoscopy and colonoscopy immediately "when the initial laboratory and stool testing was unrevealing." *Id.* According to Dr. Anderson, Plaintiff's providers fell below the standard of care by failing to perform (or by performing after significant delay) laboratory, stool, imaging, and endoscopy tests for Plaintiff's persistent and worsening pain. *Id.*

Dr. Anderson also opines that the providers failed to properly treat Plaintiff's urology issues. *Id.* at 10. He points to grievances Plaintiff submitted on November 25, 2016, December 26, 2016, and August 18, 2017, referencing his urologic issues and the recommendations of the UIC specialists, which the providers then failed to implement. *Id.* Moreover, Dr. Anderson states, given that Plaintiff did not respond to first-line medications such as Hytrin and Flomax, he should have received

13

additional testing such as urodynamic urine flow studies and a prostate ultrasound to evaluate his symptoms. *Id.*

Finally, Dr. Anderson opines that, as to Plaintiff's painful nodules, providers should have performed a soft tissue MRI or nodule biopsy to obtain a firm diagnosis. *Id.* at 11. If truly diagnosed as lipomas, Dr. Anderson says, the pain they caused "is alone an indication for surgical removal." *Id.* Pain medication, according to Dr. Anderson, "has a limited role in lipoma management." *Id.* at 11–12.

## I. Nicholson and Pfister

In his capacity as Warden, Nicholson states that he delegated the responsibility of reviewing inmate grievances to his assistant wardens and that grievances "never even came to my office." [233] at ¶ 11. Nicholson has no independent recollection of Plaintiff or his medical issues. [189] at ¶ 12. Nicholson is not a medical professional and has never received formal medical training. *Id.* at ¶ 15. Moreover, Nicholson never diagnosed or treated Plaintiff. *Id.* at ¶ 16. Plaintiff sent at least three emergency grievances to Nicholson, which Nicholson's assistant wardens either denied as emergencies or did not respond to. [233] at ¶ 8; *see* [233-3]; [233-4]; [233-5].

Similarly, in his capacity as Warden, Pfister delegated the responsibility for reviewing inmate grievances to his assistant wardens. [233] at ¶ 21. Plaintiff asserts that he sent seven emergency grievances to Pfister, all of which Pfister or his staff denied as an emergency or did not respond to. *Id.* at ¶ 19; *see* [233-6]; [233-7]; [233-8]; [233-9]; [233-10]; [233-11]; [233-12]. Like Nicholson, Pfister has no independent

14

recollection of Plaintiff or his medical issues; he is not a medical professional and has no formal medical training or experience. [189] at ¶¶ 22–23. Plaintiff testified that he "stopped" Pfister twice to communicate that he was experiencing pain, and Pfister told him "[w]rite me a letter, something along those lines." [189-3] at 44. Plaintiff also testified that he wrote Pfister letters, and that Pfister ignored his letters and responded only to one that his fiancée wrote. *Id.* at 45.

### J. Wexford

Plaintiff also attempts to impose liability upon Wexford, the employer of Drs. Okezie, Bautista, and Obaisi pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).

Dr. Neil Fisher, Wexford's Rule 30(b)(6) witness, provided deposition testimony in this case. Dr. Fisher testified about UIC, where Wexford refers inmates for specialized treatment. [220-43] at 28. Dr. Fisher characterizes UIC as a "very specialized medical center with a number of very specialized clinicians." *Id.* Dr. Fisher further testified that IDOC, not Wexford, schedules appointments at UIC. *Id.* at 29. IDOC maintains a contract with UIC detailing UIC's compensation for services rendered; therefore, if an inmate "is going to UIC, Wexford would not be paying that bill directly." [219] at ¶ 49; [220-43] at 30, 31.

Dr. Fisher also testified about Plaintiff's care at Stateville. Specifically, Dr. Fisher testified that Plaintiff has a health team at Stateville that includes dentists, psychiatrists, psychologists, nurses, and clinicians. [220-43] at 32. According to Dr. Fisher, while there is no requirement that Plaintiff see the same provider at each

15

visit, Plaintiff's medical record "is available for these clinicians and other members of the health care team" and "all members of the health care team are documenting in the inmate's medical record." *Id.* Wexford encourages its medical directors to review "consult logs" that document when off-site procedures and test results have been completed. *Id.* at 33. If then, for example, a medical director notices that Stateville has not received a particular test result, he or she would instruct someone else at Stateville to follow-up. *Id.*

### K. Plaintiff's Claims

In his operative complaint, Plaintiff alleges deliberate indifference against the individual Defendants (Count I) and deliberate indifference, under a *Monell* theory, against Wexford (Count II). All Defendants now move for summary judgment.

## II. Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 984 (7th Cir.

2020). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III. Analysis

The Eighth Amendment requires prison officials to provide healthcare to incarcerated inmates who cannot obtain healthcare on their own, *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021), and imposes liability on prison officials who act with deliberate indifference to a substantial risk of serious harm to inmates, *Eagan v. Dempsey*, 987 F.3d 667, 693 (7th Cir. 2021). The deliberate indifference standard encompasses both objective and subjective elements: "(1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Eagan*, 987 F.3d at 693 (quoting *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006)).

Here, Defendants do not dispute that Plaintiff suffers from objectively serious medical conditions. This Court therefore focuses only upon the subjective element of

the analysis, which requires Plaintiff to prove that Defendants acted "with a 'sufficiently culpable state of mind.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Requiring much more than negligence or mere malpractice, the Seventh Circuit has characterized the requisite standard as a "high hurdle" because a plaintiff must demonstrate "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotation marks omitted). In other words, a defendant must have made a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)).

### A.    Nonmedical Defendants:  Pfister and Nicholson

This Court begins with Plaintiff's claims of deliberate indifference against the former Stateville wardens, Pfister and Nicholson, both of whom Plaintiff claims denied his grievances as emergencies or failed to respond to him; Plaintiff also claims that Pfister ignored his direct, personal pleas for help.  [235] at 5–6.

On the issue of grievances, Plaintiff points to evidence that he sent Nicholson and Pfister each multiple emergency grievances complaining about his various medical conditions,[2] all of which they (or their staff) denied as emergencies or failed

---

[2] In Illinois, when "an inmate believes that he confronts an emergency situation, state law permits him to . . . submit his grievance directly to the warden."  *Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828, 832 (7th Cir. 2020).

18

to respond to. [233] at ¶¶ 8, 19; *see* [233-3]; [233-4]; [233-5]; [233-6]; [233-7]; [233-8]; [233-9]; [233-10]; [233-11]; [233-12]. Pfister and Nicholson argue that they were not deliberately indifferent because they did not personally review grievances and instead delegated those responsibilities to their staff members. [188] at 6–7. True, individual liability under § 1983 requires personal involvement in an alleged constitutional deprivation. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). Yet courts in this district have emphasized that "although the warden 'may delegate [the responsibility to review inmate grievances] to others who sign his name for him, the buck still stops at the warden.'" *Drapes v. Hardy*, No. 14 C 9850, 2019 WL 1425733, at *6 (N.D. Ill. Mar. 29, 2019) (quoting *Birch v. Jones*, No. 02 CV 2094, 2004 WL 2125416, at *7 (N.D. Ill. Sept. 22, 2004)); *see also Dixon v. Brown*, No. 3:16-CV-01222-GCS, 2021 WL 1171657, at *8 (S.D. Ill. Mar. 29, 2021) ("By delegating the responsibility to review grievances, a warden may effectively consent to and approve of how those grievances are handled."); *Thomas v. Wexford Health Servs., Inc.*, 414 F. Supp. 3d 1154, 1163 (N.D. Ill. 2019) ("Pfister cannot wholly insulate himself from personal involvement in Thomas's alleged constitutional deprivation by delegating much of the review of medical grievances to administrative assistants and claiming he was not put on notice by the emergency grievances sent to his office.") (internal quotation marks omitted). Thus, Pfister and Nicholson cannot simply use their proxies to avoid personal liability. Plaintiff has submitted sufficient evidence to allow a reasonable jury to find that Pfister and Nicholson knew about Plaintiff's serious medical conditions yet took no action.

Nicholson and Pfister also argue that, as nonmedical professionals, they were entitled to rely upon the treatment plans and recommendations of Plaintiff's doctors. [247] at 4–5. To be sure, nonmedical officials are presumptively "entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care," and therefore do not act with deliberate indifference if they rely upon the judgment of medical personnel. *Eagan*, 987 F.3d at 694 (first quoting *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008); then quoting *Miranda v. County of Lake*, 900 F.3d 335, 343 (7th Cir. 2018)). Here, however, there is no evidence that Nicholson or Pfister, in fact, deferred to the judgment of medical professionals; rather, they (or their staff) either ignored Plaintiff's grievances outright or denied them as emergencies. Nonmedical defendants "cannot simply ignore an inmate's plight." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *cf. Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019) (granting summary judgment to nonmedical professionals based upon their deference to medical professionals where the evidence showed that several of the plaintiff's grievances were not ignored or mishandled, but rather subjected to emergency review and then review by an appeals board), *cert. denied*, 140 S. Ct. 50 (2019). The wardens thus cannot defend themselves at summary judgment by claiming "deference to medical professionals" when there is no evidence in the record that they exercised such deference.

Moreover, relevant to Pfister's liability, a nonmedical defendant can face liability if a plaintiff demonstrates that a "communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an

20

excessive risk to inmate health or safety.'" *Arnett*, 658 F.3d at 755–56 (quoting *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996)); *see also Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015) (observing that "prisoner requests for relief that fall on 'deaf ears' may evidence deliberate indifference"). Plaintiff testified that he "stopped" Pfister twice to communicate that he was experiencing pain, and Pfister told him "[w]rite me a letter, something along those lines." [189-3] at 44. Plaintiff testified that he wrote Pfister letters, and that Pfister ignored his letters and responded only to one that his fiancée wrote. *Id.* at 45.

In *Diggs v. Ghosh*, the Seventh Circuit reversed the district court's grant of summary judgment in favor of a Stateville warden, finding that plaintiff's sworn testimony that he had told the warden four or five times over three years that he was waiting on surgery and had a painful knee injury was sufficient to show that the warden had knowledge of the plaintiff's predicament. 850 F.3d 905, 911 (7th Cir. 2017). Because the warden took no action, other than to tell the plaintiff to raise his issues with the medical staff, the plaintiff had demonstrated a triable issue as to his deliberate indifference. *Id.* Here, too, according to Plaintiff, he told Pfister about his pain, in person and in writing, and Pfister disregarded Plaintiff's complaints. This Court therefore also finds a triable issue of fact as to whether Pfister displayed deliberate indifference to Plaintiff's complaints based upon these in-person interactions and letters.

### B. Medical Defendants

This Court next considers Plaintiff's deliberate indifference claims against Drs. Obaisi, Bautista, and Okezie.

To constitute deliberate indifference, a medical professional must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Donald*, 982 F.3d at 458 (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). Mere negligence or a "mistake in medical judgment" does not constitute deliberate indifference. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has instructed that evidence sufficient to create a triable issue "might include the obviousness of the risk from a particular course of medical treatment"; "the medical defendant's persistence 'in a course of treatment known to be ineffective'"; or "proof that the defendant's treatment decision departed so radically from 'accepted professional judgment, practice, or standards' that a jury may reasonably infer that the decision was not based on professional judgment." *Id.* at 662–63 (quoting *Petties v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016), *as amended* (Aug. 25, 2016)).

In addition, the failure to treat pain "*can* be an Eighth Amendment violation, of course, even if it is a matter of only minutes or hours." *Howell.*, 987 F.3d at 661. Delay "need not be extreme; failing to provide a very easy treatment or accommodation can suffice, if unnecessary suffering resulted." *Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021). Where a plaintiff premises a deliberate indifference

claim on a delay in treatment, he must present "verifying medical evidence" that the delay, not the underlying condition, caused "some harm." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (quoting *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013)). And where a plaintiff complains about a healthcare professional's refusal to refer him to a specialist, that "refusal to refer supports a claim of deliberate indifference only if that choice is 'blatantly inappropriate.'" *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (quoting *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011)).

### 1. Dr. Obaisi

Initially, Obaisi's estate moves for summary judgment on Plaintiff's request for punitive damages against Dr. Obaisi, who is now deceased. [202] at 4–6.[3] In response, Plaintiff correctly concedes that the law precludes recovery of punitive damages from the estate. [227] at 14 n.6; *see, e.g., Flournoy v. Est. of Obaisi*, No. 17 CV 7994, 2020 WL 5593284, at *14 (N.D. Ill. Sept. 18, 2020) (granting summary judgment on plaintiff's request for punitive damages against Dr. Obaisi's estate because "Obaisi is deceased, so [he] can be neither punished for his conduct nor deterred from repeating it"). This Court accordingly grants summary judgment to Dr. Obaisi's estate on Plaintiff's punitive damages request against him.

Dr. Obaisi's estate next argues that Dr. Obaisi had no personal involvement in treating Plaintiff's lipomas, and thus, cannot be held liable for deliberate indifference

---

[3] Judge Bucklo, then presiding judge over this case, granted the Estate of Dr. Obaisi's motion to substitute Ghaliah Obaisi for Dr. Obaisi. [66].

as to that particular medical condition. [202] at 6–7. This argument ignores Plaintiff's evidence that he personally complained to Dr. Obaisi about the pain from his nodules and that Dr. Obaisi did nothing in response. Specifically, Plaintiff testified that he complained to Dr. Obaisi about the pain from his nodules every time he saw him from 2012 on and that, when he asked Dr. Obaisi to remove the nodules, Dr. Obaisi refused. [219] at ¶ 12. Plaintiff also recalled an encounter with Dr. Obaisi during which Dr. Obaisi asked him: "you're a prisoner, what sort of healthcare do you really think you're going to get here," and when Plaintiff replied, "the same kind of healthcare you're getting," Dr. Obaisi laughed. *Id.* at ¶ 30. Dr. Anderson, Plaintiff's retained expert, additionally opined that a soft tissue MRI or nodule biopsy should have been performed to provide a firm diagnosis. [208-8] at 11. If truly diagnosed as lipomas, Dr. Anderson says, the pain they caused "is alone an indication for surgical removal." *Id.* Pain medication, according to Dr. Anderson, "has a limited role in lipoma management." *Id.* at 11–12. Because not treating pain can constitute an Eighth Amendment violation, *Howell*, 987 F.3d at 661, Plaintiff has raised a triable issue of fact on whether Dr. Obaisi's non-responsiveness to Plaintiff's complaints of pain from his nodules amounts to deliberate indifference.

For its part, the estate counters that Plaintiff's testimony lacks probative value because he does not corroborate his self-serving recollection of the interactions with Dr. Obaisi with contemporaneous evidence. [259] at 5–6. Not so. It is well-established that a plaintiff's "first-hand account" of a conversation "is competent evidence," even if a trier of fact could reasonably infer from the "lack of mention" in a

record of a note "that the issue was not raised." *Thomas*, 991 F.3d at 769; *see also, e.g., Judkins v. Obaisi*, No. 17 CV 6540, 2021 WL 1784763, at *2 n.3 (N.D. Ill. May 5, 2021) ("A lot of testimony is self-serving, so that's not a basis for disputing a fact."). Therefore, while Defendants remain free to attack the credibility and weight of Plaintiff's uncorroborated testimony at trial, they cannot dispute that Plaintiff's testimony constitutes admissible evidence sufficient to defeat summary judgment. *See Thomas*, 991 F.3d at 767 ("Weighing evidence is for the factfinder, not the court.").

The estate next argues that summary judgment is warranted as to Dr. Obaisi's personal involvement in Plaintiff's urological and gastrointestinal conditions. [202] at 11–15. Again, the record precludes summary judgment on these issues. As to Plaintiff's urological condition, the record reflects that Plaintiff saw Dr. Obaisi multiple times during the summer and fall of 2016 regarding his lower body pain, occasional blood in his stools, and firm and enlarged prostate. [219] at ¶¶ 14, 15, 17, 20. At the earliest of these appointments, in June 2016, Dr. Obaisi prescribed Flomax.[4] *Id.* at ¶ 14. Over a year later, on August 29, 2017, Dr. Obaisi examined Plaintiff and documented the following in his notes: "Urinary frequency improved slightly. [Illegible] still has 4-5 urinations at night and very concerned about back pain and abdominal discomfort. Awaiting colonoscopy UIC." *Id.* at ¶ 29. Dr. Obaisi assessed that Plaintiff had "Benign prostatic hypertrophy with [illegible], low back pain and anxiety." *Id.* Dr. Obaisi increased Plaintiff's prescription for Flomax and prescribed Elavil at the time. *Id.* It was only later that year, on December 12, 2017,

---

[4] Doctors commonly prescribe Flomax to treat prostate issues. *See, e.g., Thomas*, 991 F.3d at 772.

that Dr. Obaisi switched Plaintiff from Flomax to a different drug, Finasteride, because Plaintiff was not responding to Flomax. *Id.* at ¶ 31. Although the record indicates that Dr. Obaisi did not outright ignore Plaintiff's urological issues, a reasonable jury could find that he displayed deliberate indifference by continuing to prescribe Flomax in August 2017 after first prescribing it to Plaintiff in the summer of 2016, despite noting that it only "slightly" improved Plaintiff's urinary frequency.

Moreover, Dr. Anderson, Plaintiff's expert, opines that since Plaintiff did not respond to first-line medications such as Hytrin and Flomax, he should have received additional testing such as urodynamic urine flow studies and a prostate ultrasound to evaluate his symptoms. [208-8] at 10.

Based upon the totality of this evidence, a reasonable jury could conclude that Dr. Obaisi persisted in a course of treatment known to be ineffective, and that the "lack of progress called for a specialist's opinion." *Sharif v. Funk*, No. 15 C 10795, 2020 WL 3545617, at *12 (N.D. Ill. June 30, 2020) (denying summary judgment to a prison doctor based upon the plaintiff's evidence that: (1) the doctor persisted in a course of treating his prostate issues with Flomax despite it not relieving his urinary symptoms, and (2) the doctor did not refer the plaintiff to a specialist despite his persisting symptoms).

Similarly, the evidence demonstrates a genuine issue of material fact as to whether Dr. Obaisi was deliberately indifferent to Plaintiff's gastrointestinal issues. As discussed above, Plaintiff saw Dr. Obiasi throughout 2016 for his pain and occasional blood in his stools. And, as evidenced by grievances Plaintiff filed in

August and September, the pain persisted and Plaintiff experienced diarrhea-like bowel movements. [219] at ¶¶ 19, 21. Plaintiff requested medical attention again a few days later on October 1, but he did not see Dr. Obaisi until November 2. *Id.* at ¶ 22. Plaintiff did not undergo a diagnostic colonoscopy until December 2017, [220-27] at 2, which resulted in Plaintiff being diagnosed with "[n]oninfective gastroenteritis and colitis." *Id.* at 5. Dr. Anderson opines, among other things, that the standard of care for treating chronic diarrhea includes lab tests, chemistry panel, ESR/CRP, celiac disease antibodies, thyroid assessment, and stool testing; moreover, because Plaintiff had "alarm features" (i.e., blood in stool, worsening abdominal pain, and symptom onset when he was over 50 years old), the standard of care requires an upper endoscopy and colonoscopy immediately "when the initial laboratory and stool testing was unrevealing. [208-8] at 9. According to Dr. Anderson, Plaintiff's providers fell below the standard of care by failing to perform (or by performing after significant delay) laboratory, stool, imaging, and endoscopy tests for Plaintiff's persistent and worsening pain. *Id.* Given the evidence of the persistence of Plaintiff's self-described pain and Dr. Anderson's testimony that the medical providers failed to provide timely tests and treatments, a reasonable jury could find that Dr. Obaisi displayed deliberate indifference to Plaintiff's pain and persisted in a course of treatment known to be ineffective. *See, e.g., Peters v. Bailey*, No. 17 C 4809, 2020 WL 5593754, at *10 (N.D. Ill. Sept. 18, 2020) (denying summary judgment where a prisoner alleged

that doctors displayed deliberate indifference by delaying and failing to adequately treat his pain and other symptoms, including blood in his stool).

Finally, the estate moves for summary judgment as to Dr. Obaisi's personal involvement with Plaintiff's back issues. Specifically, the estate argues that Plaintiff cannot base a claim upon his back issues because he failed to specifically mention it in his complaint. [202] at 7–11. But Plaintiff did reference his back issues in his second amended complaint, [114] at 1 (preliminary statement), ¶ 10, so the estate cannot complain now that it lacked notice of that portion of Plaintiff's claims.

### 2.    Dr. Bautista

This Court next considers Dr. Bautista's motion for summary judgment [198]. Plaintiff argues that the record creates a triable issue on whether Dr. Bautista was deliberately indifferent to Plaintiff's lipomas and back pain. [226] at 5.

Starting with Dr. Bautista's treatment of Plaintiff's lipomas, this Court agrees that the record contains contested evidence as to whether Dr. Bautista displayed deliberate indifference. As discussed above, Dr. Anderson opined that pain medication has a limited role in lipoma management and that a soft tissue MRI or nodule biopsy should have been done to confirm the nodules were, in fact, lipomas. [208-8] at 11–12. If they were truly lipomas, Dr. Anderson, opined, then the pain they caused was "alone an indication for surgical removal." *Id.* at 11.

Like Dr. Obaisi, Dr. Bautista never ordered an MRI or nodule biopsy and never referred Plaintiff for surgery to remove the lipomas. Indeed, the record shows that Dr. Bautista first became aware of Plaintiff's painful nodules in March 2019, when

Plaintiff complained to him about the pain during a clinic visit and Dr. Bautista instructed him to take Tylenol twice a day. [200] at ¶ 16. The record also reflects that Plaintiff complained to Dr. Bautista about numbness and tingling in his forearm in April 2019 and again on June 12, 2019, when he reported pain and numbness from forearm to finger. [219] at ¶¶ 42, 44. Dr. Bautista himself noted that Plaintiff's left forearm showed new lipomas and that tapping one elicited "travelling pain and numbness to the fifth finger." *Id.* Plaintiff visited the HCU on December 16, 2019, where he again discussed the pain associated with his lipomas. *Id.* at ¶ 46. The chart noted that there were "soft, palpable golf ball-sized subcutaneous lumps visible on forearms." *Id.*

Based upon the totality of the evidence, a jury could reasonably infer that Dr. Bautista acted with deliberate indifference to Plaintiff's lipomas because he did not order testing. Further, a reasonable jury could conclude that if testing proved that Plaintiff's nodules were in fact lipomas, Dr. Bautista displayed deliberate indifference by failing to order surgical removal by a specialist despite knowing that Plaintiff's nodules were causing him severe pain and numbness. *See Thomas*, 991 F.3d at 771 ("Failure to provide necessary relief and delaying access to a qualified specialist can lead to prolongation of pain."); *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (holding that continuing to treat severe vomiting with antacids and refusing to refer inmate to a specialist over three years created material fact issue of deliberate indifference).

29

In contrast, the record lacks sufficient evidence demonstrating that Dr. Bautista was deliberately indifferent to Plaintiff's back pain. Although Plaintiff first saw a provider for his lower back pain in March 2016, he did not discuss back pain with Dr. Bautista until September 24, 2019. [219] at ¶¶ 13, 45. Upon learning of Plaintiff's back pain, Dr. Bautista assessed Plaintiff with low back pain with sciatica, prescribed Tylenol and an increase in Cymbalta to 60 mg, referred Plaintiff to physical therapy, and requested an x-ray of Plaintiff's lumbosacral spine. *Id.* In short, far from turning a blind eye to Plaintiff's problems, Dr. Bautista prescribed medication, made a referral to a specialist for physical therapy, and ordered a diagnostic test. Based upon the record, with respect to back pain, no reasonable jury could find that Dr. Bautista's individual actions deviated "so substantially from accepted professional judgment that no reasonable physician would reach the same judgment." *Thomas*, 991 F.3d at 772. Accordingly, this Court grants summary judgment to Dr. Bautista on the issue of his treatment of Plaintiff's back pain.

### 3. Dr. Okezie

This Court next considers Dr. Okezie's motion for summary judgment. [198]. Plaintiff's deliberate indifference claim against Dr. Okezie is directed only at Dr. Okezie's treatment of Plaintiff's nodules. [230] at 5.

As above, this Court finds that the record precludes summary judgment to Dr. Okezie. Dr. Okezie first assessed Plaintiff on June 8, 2018, where his notes reflect that he ruled out lipoma and prescribed an antibiotic. [219] at ¶ 34. When Plaintiff saw Dr. Okezie about a month later, in July 2018, Dr. Okezie noted that Plaintiff

complained about the pain from the nodules, and Dr. Okezie initially referred Plaintiff for general surgery. *Id.* at ¶¶ 35–36. But for some reason, Dr. Okezie decided ultimately not to authorize the referral and instead opted to treat Plaintiff "onsite." *Id.* at ¶ 37. According to Plaintiff, treatment "onsite" meant that the providers were merely observing his condition. *Id.* Additionally, Plaintiff testified that Dr. Okezie laughed at him and said "it's impossible" for the nodules to cause pain. *Id.* at ¶ 38.

Given Dr. Anderson's opinions, as discussed above, that a soft tissue MRI or nodule biopsy should have been performed, and that, if diagnosed as lipomas, the pain they caused was "alone an indication for surgical removal," [208-8] at 11, a reasonable jury could conclude that Dr. Okezie's ultimate decision to not refer Plaintiff to surgery reflected deliberate indifference to Plaintiff's pain. *See Thomas*, 991 F.3d at 769 (noting that "a physician's delay, even if brief, in referring an inmate to a specialist in the face of a known need for specialist treatment may also reflect deliberate indifference"). Further, because a "single incident" of a "deliberate and potentially malicious act" can "make out a claim for deliberate indifference," *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004), Plaintiff's testimony that Dr. Okezie laughed at his complaints of pain, if believed, could also lend support for a reasonable jury's potential finding that Dr. Okezie consciously ignored Plaintiff's serious medical condition. For these reasons, this Court denies Dr. Okezie's motion for summary judgment.

### C. Wexford

Turning to Plaintiff's *Monell* claim, Wexford faces liability under Section 1983 for constitutional injuries caused by "(1) an express government policy; (2) a widespread and persistent practice that amounted to a custom approaching the force of law; or (3) an official with final policymaking authority." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). Here, Plaintiff does not contend that any person with final policymaking authority caused his injury. Nor does he argue that Wexford officially promulgated an express unconstitutional policy. He instead posits that Wexford has a custom and practice of subjecting inmates to unreasonable delays in scheduling and treating medical conditions, and another custom and practice of failing to implement coordinated, continuous treatment of inmates' chronic medical conditions. [223] at 17–24.

To raise a triable issue of fact on a custom or practice theory, Plaintiff must provide evidence of more than "one or two missteps," and instead, must demonstrate the existence of "systemic and gross deficiencies." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (internal quotation marks omitted). Though "not impossible for a plaintiff to demonstrate the existence of an official policy or custom by presenting evidence limited to his experience," it is "necessarily more difficult" because the law requires evidence of a "true municipal policy at issue, not a random event." *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (quoting *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006), *overruled by Ortiz v. Werner Enters.*, 834 F.3d 760 (7th Cir. 2016)); *see also Hildreth*, 960 F.3d at 426–27. The Seventh Circuit has held that

evidence of four instances that a plaintiff alone experienced is "simply not enough to foster a genuine issue of material fact that the practice was widespread." *Hildreth*, 960 F.3d at 427–28 & n.6.

Taking up first Plaintiff's theory of unreasonable delays, the record lacks sufficient evidence of a true widespread municipal custom or practice. Plaintiff complains about a handful of delays: (1) the delay in having surgical removal of his nodules; (2) the five-month delay between his referral by Dr. Obaisi to see a specialist for his abdominal pain and the appointment at UIC; (3) the six-month lapse between the initial order for his colonoscopy and the actual procedure at UIC; (4) the five-month delay after his colonoscopy for his follow-up appointment; (5) the one-year delay between the time he first presented with back pain and his referral to physical therapy; and (6) the six-year delay between Plaintiff's onset of urinary difficulties and when providers provided a new course of treatment. [223] at 18–20. Initially, with respect to his abdominal issues and colonoscopy (points 2–4 above), Plaintiff does not show that the delays are in any way Wexford's fault. Indeed, the evidence shows the contrary: Dr. Fisher testified that IDOC employees, not Wexford, typically schedule the appointments at UIC. [220-43] at 29. And the other types of alleged delays (points 1, 5–6), on their own, also do not suffice to demonstrate a widespread practice or custom because they are "insufficiently numerous" to demonstrate a widespread institutional deficiency. *Hildreth*, 960 F.3d at 426.

Plaintiff counters by invoking Dr. Fisher's testimony that if an inmate "is going to UIC, Wexford would not be paying that bill directly." [219] at ¶ 49. Based upon

33

this testimony, Plaintiff speculates that Wexford maintains a practice of delay by waiting for appointments at UIC, rather than utilizing other hospitals, as a cost-cutting measure. [223] at 21. But Dr. Fisher's general statement that Wexford does not foot the bill for UIC referrals, without more, fails to demonstrate a widespread cost-cutting practice that caused the alleged delays in Plaintiff's treatment. *See Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006) (noting that a single statement offering a general conclusion that was not specifically targeted to the plaintiff's claims amounted "to little more than a bald and conclusory statement"). And in any event, as discussed, Plaintiff has not set forth sufficient evidence that the delays he complained of were, in fact, Wexford's fault.

Plaintiff's alternative theory that Wexford has a practice of failing to adequately treat serious medical conditions is similarly deficient. Plaintiff cites the Seventh Circuit's decision in *Glisson v. Indiana Department of Corrections*, 849 F.3d 372 (7th Cir. 2017), to support this theory. There, the Seventh Circuit, sitting en banc, reversed the district court's grant of summary judgment on plaintiff's estate's claims that a medical services provider for the Indiana Department of Corrections failed to implement a coordinated chronic care treatment program for an inmate who suffered from multiple serious illnesses, including laryngeal cancer, alcohol dependence, difficulty speaking due to a laryngectomy, trouble swallowing, difficulties walking, and severe curvature of the spine. *Id.* at 374. The plaintiff died thirty-seven days after entry into the prison; notably, the plaintiff's family provided certain medical equipment for the plaintiff's care at the prison, but the plaintiff never

received it, and the plaintiff saw ten medical providers over the course of his incarceration, none of whom developed a medical treatment plan, even though his physical and mental deterioration was patently evident. *Id.* at 382, 375–76. The court also noted the existence of evidence indicating that the medical services provider consciously chose not to follow Indiana prison medical service guidelines recommending the development of a treatment plan for inmates with chronic illnesses. *Id.* at 379–80. Based upon the totality of the evidence, the court determined that a jury could reasonably conclude that the medical services provider's "decision not to enact centralized treatment protocols for chronically ill inmates led directly to his death." *Id.* at 382.

This case is not *Glisson,* however. Here, the record contains no evidence that Wexford has made a conscious decision to not coordinate care for chronically ill inmates. *See id.* at 375 (framing the critical question as whether the medical services provider made a "deliberate policy choice pursuant to which no one was responsible for coordinating his overall care"). Plaintiff claims that Wexford doctors lack complete charts and have no centralized method of ensuring follow ups on appointments and test results, [223] at 24, but the evidence fails to support this proposition. Contrary to Plaintiff's claims, Dr. Fisher testified that Plaintiff's medical record "is available for these clinicians and other members of the health care team" and "all members of the health care team are documenting in the inmate's medical record." [220-43] at 32. Moreover, Wexford encourages its medical directors to review "consult logs" that document when off-site procedures and test results have been

completed. *Id.* at 33. If then, for example, a medical director notices that Stateville has not received a particular test result, he or she would instruct someone else at Stateville to follow-up. *Id.* In sum, the record fails to contain evidence from which a jury could reasonably conclude that Wexford made a deliberate policy choice to not coordinate care. *See Thomas*, 991 F.3d at 774 (affirming summary judgment to Wexford on a *Monell* claim positing that Wexford failed to provide coordinated care because the record did not contain any evidence of an "overriding policy" that drove its decisions). This Court therefore grants summary judgment to Wexford.

## IV. Conclusion

For the reasons stated above, this Court grants Wexford's motion for summary judgment [204]; grants in part and denies in part Dr. Obaisi's motion for summary judgment [201]; grants in part and denies in part Dr. Bautista's motion for summary judgment [198]; denies Dr. Okezie's motion for summary judgment [194]; and denies Nicholson and Pfister's motion for summary judgment [187].

Dated: September 28, 2021

Entered:

John Robert Blakey
United States District Judge

36